1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11

JOSE FRUCTUOSO,

12

    Petitioner,

13

  v.

14

DANIEL PARAMO, Warden,

15

    Respondent.

16

Case No. CV 14-2481 SS

**MEMORANDUM DECISION AND ORDER**

17

**I.**

18

**INTRODUCTION**

19
20

   Effective March 20, 2014, Jose Fructuoso ("Petitioner"), a

21

California state prisoner proceeding <u>pro se</u>, filed a Petition for

22

Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.[1]  (Dkt. No. 1).

23

On October 31, 2014, Respondent filed an Answer to the Petition

24
25
26
27
28

---

[1]  "When a prisoner gives prison authorities a habeas petition or
other pleading to mail to court, [pursuant to the mailbox rule,]
the court deems the petition constructively 'filed' on the date it
is signed[.]" <u>Roberts v. Marshall</u>, 627 F.3d 768, 770 n.1 (9th Cir.
2010); <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988).  Here, that date
was March 20, 2014.

with an accompanying Memorandum of Points and Authorities ("Ans. Mem."). (Dkt. No. 18). Respondent has also lodged relevant portions of the record from Petitioner's state court proceedings, including a one-volume copy of the Clerk's Transcript ("CT") and a seven-volume copy of the Reporter's Transcript ("RT") from Petitioner's trial. (Dkt. Nos. 13, 19). On February 2, 2016, Petitioner filed a Reply with an accompanying Memorandum of Points and Authorities ("Reply Mem."). (Dkt. No. 35). For the reasons discussed below, the Court DENIES the Petition and DISMISSES this action with prejudice.[2]

## II.
### PRIOR PROCEEDINGS

On November 23, 2011, a Los Angeles County Superior Court jury convicted Petitioner of one count of second degree murder in violation of California Penal Code ("P.C.") § 187, and also found it to be true that Petitioner personally used a deadly or dangerous weapon within the meaning of P.C. § 12022(b)(1). (CT 266, 272-73). On February 10, 2012, the trial court sentenced Petitioner to 16 years to life in state prison. (CT 289-90, 292-93; RT 4507-08, 4808-09).

Petitioner appealed his convictions and sentence to the California Court of Appeal (Second Appellate District, Div. 4), which affirmed the judgment in an unpublished opinion filed on

---

[2] The parties have consented to proceed before a Magistrate Judge. (See Dkt. Nos. 7, 11, 14).

April 8, 2013.  (Lodgments 1-4).  Petitioner then filed a petition for review in the California Supreme Court, which denied the petition without citation to authority on July 10, 2013. (Lodgments 8-9).

### III.

### FACTUAL BACKGROUND

The following facts, taken from the California Court of Appeal's written decision on direct review, have not been rebutted with clear and convincing evidence and must, therefore, be presumed correct.  28 U.S.C. § 2254(e)(1); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).  The Court here only includes facts relevant to Petitioner's habeas petition.

On the afternoon of January 1, 2010, Bennett Bradley's downstairs neighbor saw him outside, watering his garden while talking on a cordless telephone.  At 5:00 p.m. the same day, the neighbor heard footsteps upstairs in Bradley's apartment and the sound of someone moving furniture.  When Bradley, a theatrical director, did not appear for a meeting at work on January 2, a coworker went to his apartment.  Bradley was dead on the floor of the living room with his throat slashed and his pants twisted and down around his legs.  The outside doors to his apartment were open.  His wallet was found near his body, with the cash missing.  His bedroom had

1    been ransacked, and there was blood in the living room
2    and bathroom . . .

3

4        Telephone records established that numerous calls
5    were made from Bradley's telephone to [Petitioner's]
6    between December 31, 2009 and January 1, 2010, and that
7    [Petitioner] returned the calls.  [Petitioner] lived one-
8    half block from Bradley's apartment.   A carving knife
9    was found in [Petitioner's] living room which had blood
10   consistent with Bradley's DNA profile on it.

11

12       [Petitioner] was arrested.   During the booking
13   process, [Petitioner] told an officer that he had met
14   "'the other guy'" when he was 16, and that he had sex
15   with the other guy.  [Petitioner] was then 25 years old.
16   He said he had encountered the victim again recently and
17   that they had gone back to the victim's place.
18   [Petitioner] said the victim was having sex with him "so
19   hard."   He told the officer he had the knife with him
20   because he was a recycler.

21

22   (Lodgment 4 at 2-3).

23

24                           **IV.**

25                  **PETITIONER'S CLAIMS**

26

27       The Petition raises six grounds for federal habeas relief.  In
28   Ground One, Petitioner contends the trial court improperly required

him to waive his Fifth Amendment privilege against self-incrimination in order to preserve his Sixth Amendment right to present a defense. (Petition at 7; Reply Mem. at 4-14). In Ground Two, Petitioner contends the prosecutor committed misconduct during his cross-examination of Petitioner when he: (a) accused Petitioner of being a prostitute; (b) asked Petitioner about a concealed knife; and (c) questioned Petitioner about whether Petitioner had ever observed animals being slaughtered. (Petition at 7; Reply Mem. at 15-22). In Ground Three, Petitioner asserts that admission of expert witness testimony about DNA evidence violated his Sixth Amendment right to confront the witnesses against him. (Petition at 7; Reply Mem. at 22-37). In Ground Four, Petitioner claims a police officer transporting him to jail improperly questioned him in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).[3] (Petition at 8; Reply Mem. at 37-43). In Ground Five, Petitioner alleges the trial court failed to adequately respond to the jury's question about the difference between first and second degree murder. (Petition at 8; Reply Mem. at 43-49). In Ground Six, Petitioner claims the evidence is insufficient to demonstrate he committed second degree murder. (Petition at 8-9; Reply Mem. at 50-55).

\\

\\

\\

\\

---

[3] Ground Four also initially alleged that Petitioner was denied his Sixth Amendment right to counsel. (<u>See</u> Petition at 8). However, Respondent argued the Sixth Amendment claim was unexhausted. Petitioner agreed, and requested the Court strike the unexhausted (Sixth Amendment) portion of Ground Four. The Court granted Petitioner's request. (Dkt. Nos. 12, 15-16).

**V.**

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 562 U.S. 86, 98 (2011). Under AEDPA's deferential standard, a federal court may grant habeas relief only if the state court adjudication was contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court, or was based upon an unreasonable determination of the facts. Id. at 100 (citing 28 U.S.C. § 2254(d)). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations and internal quotation marks omitted).

Petitioner raised his claims in his petition for review to the California Supreme Court, which denied the petition without comment or citation to authority. (Lodgments 5-6). The Court "looks through" the California Supreme Court's silent denial to the last reasoned decision as the basis for the state court's judgment. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2013) ("[W]e conclude that

1  <u>Richter</u> does not change our practice of 'looking through' summary

2  denials to the last reasoned decision – whether those denials are

3  on the merits or denials of discretionary review." (footnote

4  omitted)), <u>as amended</u>, 733 F.3d 794 (9th Cir. 2013), <u>cert. denied</u>,

5  134 S. Ct. 1001 (2014).   Therefore, in addressing Grounds One

6  through Four and Six, the Court will consider the California Court

7  of Appeal's reasoned opinion addressing those claims.   <u>Berghuis v.</u>

8  <u>Thompkins</u>, 560 U.S. 370, 380 (2010).   However, the Court will

9  address Ground Five <u>de novo</u>.[4]   <u>See</u> <u>Id.</u> at 390 ("Courts can . . .

10  deny writs of habeas corpus under § 2254 by engaging in de novo

11  review when it is unclear whether AEDPA deference applies, because

12  a habeas petitioner will not be entitled to a writ of habeas corpus

13  if his or her claim is rejected on de novo review[.]"); <u>Norris v.</u>

14  <u>Morgan</u>, 622 F.3d 1276, 1290 (9th Cir. 2010) (affirming denial of

15  habeas corpus petition when claim failed even under <u>de novo</u>

16  review); <u>Frantz v. Hazey</u>, 533 F.3d 724, 735-37 (9th Cir. 2008) (<u>en</u>

17  <u>banc</u>) (a federal habeas court can review constitutional issues <u>de</u>

18  <u>novo</u> before performing a § 2254(d)(1) analysis).

19  \\

20  \\

21

22  [4] Although Petitioner cited both state and federal law in relation
to Ground Five (<u>see</u> Lodgment 1 at 74, 77-78, 83; <u>see also</u> Lodgment
23  5 at 32, 38 (petition for review citing both state and federal
law), the California Court of Appeal discussed only the state law
24  aspect of Ground Five.   (<u>See</u> Lodgment 4 at 28).   Since Ground Five
must be denied even on <u>de novo</u> review, the Court need not consider
25  the applicability of the <u>Johnson v. Williams</u> presumption.   <u>See</u>
26  <u>Johnson v. Williams</u>, 133 S. Ct. 1088, 1096 (2013) ("When a state
court rejects a federal claim without expressly addressing that
27  claim, a federal habeas court must presume that the federal claim
was adjudicated on the merits — but that presumption can in some
28  limited circumstances be rebutted.").

**VI.**

**DISCUSSION**

**A.    Petitioner Is Not Entitled To Relief On Ground One**

In Ground One, Petitioner claims the trial court improperly required him to waive his Fifth Amendment privilege against self-incrimination in order to preserve his Sixth Amendment right to present a defense.  (Petition at 7; see also Reply Mem. at 4-14). More particularly, Petitioner complains that the trial court ruled that Petitioner's expert witness, Nancy Kaser-Boyd, Ph.D., could not testify about statements Petitioner made to her unless those statements were already in the record.  (See RT 2798-99 ("My ruling is that the expert cannot relay the statements about the incident to the jurors, the statements made by [Petitioner]. . . .  If [Petitioner] testifies and lays it all out as he told the doctor, then that's a different story.  She can testify because that evidence . . . will already be in the record.")).

**1.   Background**

The California Court of Appeal set forth the following facts underlying this claim:

Before trial, the prosecutor moved to limit the examination of defense expert witness, [forensic psychologist] Dr. Kaser-Boyd, and to exclude inadmissible hearsay in the guise of expert opinion.  One

8

1    of his arguments was that the defense could not put
2    [Petitioner's] statements before the jury in the guise
3    of using them as a basis for Dr. Kaser-Boyd's opinion
4    that he suffered from [post-traumatic stress disorder
5    ("PTSD")].  At the outset of the discussion of that
6    motion, the court [addressed] the order of the witnesses.
7    Defense counsel said: "As an offer of proof, I'm letting
8    the court know my client will be testifying."  The court
9    asked why defense counsel did not plan to call
10    [Petitioner] right away since he planned to testify.
11    Defense counsel said she was not ready to have him
12    testify on direct because she had been preparing for the
13    examination of Dr. Kaser-Boyd.

15         The court then took up the prosecution's motion to
16    require [Petitioner] to testify first in order to lay a
17    foundation for Dr. Kaser-Boyd's testimony about the basis
18    for her opinion that he suffered from PTSD.  The court
19    asked whether [Petitioner] would testify before Dr.
20    Kaser-Boyd.  Defense counsel said that he would not, and
21    that he did not have to because the expert witness could
22    testify about hearsay statements which were used to form
23    her opinions.  The prosecutor argued that this was a
24    backdoor method of placing [Petitioner's] statements
25    before the jury without his testimony.  Defense counsel
26    said she was confused about the prosecutor's concern
27    because she had represented to the court that
28    [Petitioner] would testify.  The court observed that if

[Petitioner] changed his mind about testifying, the prosecutor would have no way of challenging Dr. Kaser-Boyd's testimony about what [Petitioner] told her.

The trial court tentatively ruled that Dr. Kaser-Boyd could not testify unless [Petitioner] testified[.] It took a recess to read [a case] cited by defense counsel. . . . Defense counsel argued that the court's ruling would force [Petitioner] to choose between invoking his Fifth Amendment privilege not to testify or having Dr. Kaser-Boyd prevented from testifying about the basis for her PTSD opinion. The court relied on the rule that it had the discretion to weigh the probative value of the inadmissible evidence relied upon by an expert witness against the risk that the jury might improperly consider it as independent proof of those facts. . . . The court ruled that unless [Petitioner] testified about his history of sexual abuse, Dr. Kaser-Boyd could not testify about his statements which were a basis for her opinion that he suffered from PTSD. [Petitioner] testified before Dr. Kaser-Boyd.

(Lodgment 4 at 4-5 (citations omitted); see also CT 168-88; RT 2787-2800).

\\

\\

\\

\\

10

**2.   California Court of Appeal's Opinion**

The California Court of Appeal set forth the issue, as follows:

> [Petitioner] argues the trial court erred in requiring him to testify as to the factual basis for a defense expert's testimony that he suffered from [PTSD]. He claims he was forced to waive his Fifth Amendment privilege against self[-]incrimination in order to preserve his Sixth Amendment right to present the PTSD defense.  [¶]  . . .  The question presented by [Petitioner] is more properly framed as whether the trial court erred in ruling that [Petitioner's] testimony was required to lay an adequate foundation for the testimony of the expert witness on PTSD.  We review the trial court's ruling on that question for abuse of discretion.

(Lodgment 4 at 3-4).  The California Court of Appeal, relying on California case law and the California Evidence Code, concluded that, on the record presented, there was "no abuse of the trial court's discretion in requiring [Petitioner] to testify to a factual foundation for Dr. Kaser-Boyd's opinion that he suffered from PTSD. . . .  [T]he trial court acted within its discretion in concluding that admission of [Petitioner's] statements through the expert's testimony would allow the jury to consider those statements for the truth of the matter asserted."  (Lodgment 4 at 7-10).

### 3.  Analysis

#### a.  State Law Claims

Although Petitioner claims the trial court violated his Fifth Amendment privilege against self-incrimination, his argument relies almost entirely on California law.  (See, e.g., Reply Mem. at 8 ("The court's ruling that [P]etitioner had to testify before Dr. Kaser-Boyd could testify was wrong as a matter of law. [California] Evidence Code [§] 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based[.]'")).  However, a federal court, in conducting habeas review, is limited to deciding whether a state court decision violates the Constitution, laws or treaties of the United States.  28 U.S.C. § 2254(a); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Federal habeas corpus relief "does not lie for errors of state law[,]" Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." (emphasis in original)), and Petitioner "may not transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997).  Therefore, to the extent Petitioner claims – in Ground One or in any of his other claims for relief – that he is entitled to habeas corpus relief due to an alleged state law violation, or because the trial court abused its discretion, any

12

such claim is not cognizable in this proceeding.[5]  See Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998) (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion.").

        b.    Ground One Is Without Merit

    The Fifth Amendment provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  This privilege against self-incrimination, which applies to the states through the Fourteenth Amendment, "guarantees . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own free will, and to suffer no penalty . . . for such silence."  Malloy v. Hogan, 378 U.S. 1, 8 (1964); see also Harris v. New York, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.").  "The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent

---

[5]  Indeed, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam); see also Hicks on behalf of Feiock v. Feiock, 485 U.S. 624, 629-30 & n.3 (1988) ("We are not at liberty to depart from the state appellate court's resolution of these issues of state law.  Although petitioner marshals a number of sources in support of the contention that the state appellate court misapplied state law on these two points, the California Supreme Court denied review of this case, and we are not free in this situation to overturn the state court's conclusions of state law.").

labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" Estelle v. Smith, 451 U.S. 454, 462 (1981) (citations and emphasis omitted).  However, "the Fifth Amendment proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'  Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." United States v. Washington, 431 U.S. 181, 187 (1977).  Thus, for instance, while in certain cases "there are undoubted pressures[] generated by the strength of the government's case against [a criminal defendant] pushing [him] to testify[,]" those pressures do not "constitute 'compulsion' for Fifth Amendment purposes." Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 287 (1998); Williams v. Florida, 399 U.S. 78, 83-84 (1970).

Petitioner contends the trial court's evidentiary ruling limiting Dr. Kaser-Boyd's testimony about statements Petitioner made to her unless those statements were already in the record forced him to choose between his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to present a defense, but he cites no pertinent authority supporting this argument.[6]  To the contrary, such decisions have consistently been held not to infringe upon a petitioner's privilege against self-

---

[6]  Petitioner's claim is more than a little disingenuous since the trial court was informed Petitioner was going to testify regardless of the trial court's ruling.  (See, e.g., RT 2789 ("I [defense counsel] am representing to the court that [Petitioner] will be testifying.  So [Dr. Kaser-Boyd's] statements won't be offered for the truth as a backdoor to get [Petitioner's] statements in. [Petitioner] will testify.  So that should be a non-issue.")).

incrimination.  See Williams, 399 U.S. at 84 ("That the defendant faces . . . a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination."); Menendez v. Terhune, 422 F.3d 1012, 1032 (9th Cir. 2005) ("The judge did not require the defendants to take the stand; he merely regulated the admission of evidence, and his commentary as to what evidence might constitute a foundation did not infringe on Petitioners' right to decide whether to testify."); United States v. Perkins, 937 F.2d 1397, 1404-05 (9th Cir. 1991) (defendant's "tactical decision to testify" based on his "own subjective perception of what constitutes a proper trial strategy" does not violate the Fifth Amendment's privilege against self-incrimination, even if the defendant felt it necessary to testify because of the district court's evidentiary rulings); United States v. Garro, 268 F. App'x 573, 575 (9th Cir. 2008) ("[A]ny decision of Garro to testify in order to lay [a] foundation for the tape's admission was a tactical one and not compelled in violation of the Fifth Amendment"); United States v. Singh, 811 F.2d 758, 762 (2d Cir. 1987) ("[T]he court did not compel appellant to testify at all. It merely refused to accept the proffered testimony of other witnesses until a proper foundation was laid. There was nothing erroneous about this.").

    Therefore, the rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.[7]

---

[7]  Petitioner contends AEDPA deference is inapplicable to this claim because the California Court of Appeal did not specifically

**B.   Petitioner Is Not Entitled To Relief On His Prosecutorial Misconduct Claims**

In Ground Two, Petitioner contends the prosecutor committed misconduct during his cross-examination of Petitioner when he: (a) accused Petitioner of being a prostitute; (b) asked Petitioner about a concealed knife; and (c) questioned Petitioner about whether Petitioner had ever observed animals being slaughtered. (Petition at 7; Reply Mem. at 15-22).

**1.   Factual Background**

The California Court of Appeal set forth the following facts underlying these claims:

> 1.   *Prostitution*
>
> [Petitioner] argues it was improper for the prosecutor to ask [Petitioner] if he had told detectives

---

discuss Petitioner's Fifth Amendment argument. (Pet. Mem. at 6-7). However, the California Court of Appeal was well aware of the argument Petitioner was making (see Lodgment 4 at 3-4 ("[Petitioner] claims he was forced to waive his Fifth Amendment privilege against self[-]incrimination in order to preserve his Sixth Amendment right to present the PTSD defense."), 5-6 ("[Petitioner] claims the [trial] court's ruling required that he waive his Fifth Amendment privilege against self-incrimination in order to preserve his Sixth Amendment right to present a defense")), and the Court presumes the California Court of Appeal denied this claim on the merits. Williams, 133 S. Ct. at 1096. Petitioner has not rebutted this presumption. In any event, for the reasons discussed herein, Petitioner's claim fails even if subject to de novo review.

that he had prostituted himself for money.  He cites a series of questions during his cross-examination in which [Petitioner] denied asking Bradley for money in exchange for sex.  [Petitioner] denied prostituting himself for money.  The court sustained a defense objection to a question asking whether [Petitioner] prostituted himself for people who "appreciate" it.  The prosecutor then asked: "Mr. Fructuoso, you told Detective Frettlhor that you don't like to prostitute yourself for money; isn't that true?"  There was no objection, and [Petitioner] answered "Yes."  The court overruled an objection when the prosecutor next asked whether [Petitioner] told Detective Frettlhor that he did prostitute himself for money, but only to people "who appreciate" it.  When the interpreter said the question had not been interpreted, the prosecutor asked whether [Petitioner] told Detective Frettlhor that he did prostitute himself.  An objection was overruled and [Petitioner] denied saying both that, and that he only prostituted himself for people who appreciate it.  [Petitioner] also denied committing prostitution with another man.

At sidebar, defense counsel argued that the transcript of [Petitioner's] interview with the detectives clearly showed that [Petitioner] denied engaging in prostitution for money.  The prosecutor disagreed, quoting the transcript in which [Petitioner] said he did not prostitute himself, and "I just like to

do it with persons I like."  The prosecutor told the
court he planned to play this recording for the jury.
Defense counsel continued to argue that [Petitioner]
consistently denied prostituting himself for money
during the interview.  The court read the transcript and
ruled that the prosecutor had a good faith basis to
inquire into this area, and overruled the objection.  The
court advised defense counsel that she could examine
[Petitioner] about the conversation on redirect.

Later, outside the presence of the jury, the
prosecutor asked to make a record regarding his good
faith basis for asking [Petitioner] whether he told the
detective he had prostituted himself.  He read the
following portion of the transcript of the police
interview into the record regarding [Petitioner's]
relationship with another man: "Question, 'bisexual?
Okay, now your relationship, your relationship with
Danny, was that just for money, or did you do it sometimes
for — because you wanted to?'  'Well, that happened at a
time, well, that he had me, and I didn't think there was
a reason to say or to reject him or — but I did like
him.' [¶] 'You liked him?' [¶] 'Yes.  I did like — yes,
and I didn't like prostituting myself for money, no.'
[¶]  'But did you do it?'  [¶]  'Yes.'"  The prosecutor
said this was the basis for his good faith belief that
[Petitioner] told the detective he had prostituted
himself for money and with Danny.  The prosecutor read

the next portion of the interview transcript in which
the detective asked [Petitioner] how long he had been
prostituting himself.   [Petitioner] once again denied
that, and said "'I just like to do it with a person I
like.'"

Defense counsel argued that "it" in the last quoted
sentence could refer to either prostitution or sex.  She
contended it was not a reference to prostitution because
[Petitioner] corrected the detective and said "'No, I
didn't prostitute myself.'"  The court said that it had
allowed the question and asked the prosecutor whether he
planned further examination of [Petitioner] on that
issue.  The prosecutor said he did not, that he just
wanted to demonstrate the basis for his good faith belief
in the propriety of that line of questioning.
Ultimately, the prosecutor chose not to play the
interview for the jury.

2.  *Concealed Knife*

After a recess, the court said: "I have a note from
one of the jurors who has a different view concerning
the interpretation, and I'm going to read it in the
record.  Then counsel may want to inquire again to see
if you can clarify the point, whether Mr. Haidar [the
prosecutor] said something to the effect of, quote "'In
fact, that's when you pulled the knife out of your

pants?' Or, quote, 'Translator never mentioned anything about his pants or the knife being concealed.'" The court invited counsel to consider the note and decide whether they wanted to reexamine [Petitioner] about these questions. Redirect examination of [Petitioner] resumed, and he was asked whether he had a weapon concealed in his pants on January 2, 2010 when he went to Bradley's apartment. [Petitioner] said he did not.

3. *Observation of Animal Slaughtering*

In cross-examination of [Petitioner], the prosecutor asked him about his work in produce at a market in Oaxaca before he came to the United States. The prosecutor asked whether animals were slaughtered at that market. [Petitioner] said no, small animals were sold. When the prosecutor asked whether they were sold alive, the trial court sustained an objection that there was no good faith basis for those questions. Objections were sustained to questions as to whether [Petitioner] had seen animals being slaughtered while in Mexico.

At a sidebar conference, the prosecutor argued that whether [Petitioner] had observed animals being slaughtered by slitting their throats was "relevant to his knowledge and ability to [do] what he did to Bennett Bradley which is slitting his throat." Defense counsel objected that there was no evidence that [Petitioner]

20

slaughtered animals, and that the question was argumentative. She complained that the prosecutor had repeatedly asked questions containing a fact not in the record which could not be proven, which was prejudicial to [Petitioner]. She contended the prosecutor had no good faith basis to believe that animals were slaughtered in the market where [Petitioner] worked in Oaxaca. The court responded: "That's not an unusual position to take." Defense counsel argued that this line of questioning was prejudicial misconduct because the prosecutor was, in effect, testifying to facts not in evidence.

In arguing that the question about animal slaughtering was part of a pattern of misconduct by the prosecutor, defense counsel cited the note from a juror about the interpretation of testimony regarding whether [Petitioner] concealed a knife in his pants. Defense counsel argued that this note demonstrated that one of the jurors had observed that the prosecutor was testifying to facts in the context of his questions to [Petitioner].

The prosecutor responded: "It's common knowledge. I've been to Mexico. These small towns, they slaughter animals. It's not anything unusual." Defense counsel demanded an offer of proof from the prosecutor as to the

1     basis for a belief that [Petitioner] has a specific

2     knowledge about how to slaughter animals.

3

4         The court ruled that the entire line of questioning

5     was not irrelevant and that the prosecutor had not acted

6     improperly.  It observed: "I just think that it's common

7     sense that if you cut someone's throat, they are either

8     going to die or be severely injured for a long time.  I

9     think it's a waste of time.  That's why I sustained the

10    objections."  The prosecutor was admonished to move on

11    to another line of questioning and did so.

12

13  (Lodgment 4 at 11-14; see also RT 3166-71, 3175-76, 3188-90, 3203-

14  04, 3315-16, 3327-30, 3342).

15

16    **2.    California Court of Appeal's Opinion**

17

18      The California Court of Appeal determined that Petitioner had

19  not properly preserved his prosecutorial misconduct claims.

20  (Lodgment 4 at 15).  Alternately, the California Court of Appeal

21  held that the claims were meritless, stating:

22

23        Even assuming that all of the misconduct claims are

24    preserved for appeal, we find no basis for reversal.  As

25    to the prostitution line of questioning, we conclude the

26    prosecutor demonstrated a good faith belief in the facts

27    underlying these questions.  "'"It is improper for a

28    prosecutor to ask questions of a witness that suggest

                                  22

facts harmful to a defendant, absent a good faith belief that such facts exist."'"   The prosecutor's questions were properly based on the portion of the interview with the detective in which [Petitioner] said he prostituted himself for money, although he did not like it.   Any ambiguity in this statement could have been addressed by defense counsel on redirect.   It was relevant to [Petitioner's] defense that the murder occurred when Bradley attempted to rape him, as he had done when [Petitioner] was 16.

Similarly, since the knife with Bradley's blood was found in [Petitioner's] apartment, the prosecutor had a good faith basis to ask [Petitioner] whether he had the knife concealed in his clothing when he went to Bradley's apartment.   We agree with respondent that the juror's note appeared to refer to problems the juror had with the interpretation rather than the prosecutor's conduct.

We find less support for the prosecutor's questions about [Petitioner's] observation of animal slaughter in Mexico while working at a market.   But the trial court sustained defense objections that the prosecutor had no good faith factual basis for this line of questioning. After objections to two questions were sustained, a sidebar was held.   Although the court found the prosecutor had not acted improperly, it found the questions were a waste of time and directed the

1    prosecutor to move on to another topic.  Defense counsel

2    failed to ask the court to admonish the jury to disregard

3    the questions.   The jury was instructed that the

4    questions by counsel are not evidence.  It was told: "Do

5    not assume that something is true just because one of

6    the attorneys asked a question that suggested it was

7    true."  On this record, we find no prejudicial misconduct

8    under either the state or federal standards.

9

10   (Lodgment 4 at 16-17 (citation omitted)).

11

12       **3.  Analysis**

13

14       Prosecutorial misconduct rises to the level of a

15   constitutional violation only where it "'so infected the trial with

16   unfairness as to make the resulting conviction a denial of due

17   process.'"[8] Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting

18   _____

19   [8] Respondent contends Ground Two is procedurally defaulted.  (Ans.
     Mem. at 22-23).  However, the Court will not address this argument
20   because it retains the discretion to deny claims on the merits even
     if the claims are alleged to be procedurally defaulted.   See
21   Flournoy v. Small, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) ("While
     we ordinarily resolve the issue of procedural bar prior to any
22   consideration of the merits on habeas review, we are not required
     to do so when a petition clearly fails on the merits."); Franklin
23   v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[C]ourts are
     empowered to, and in some cases should, reach the merits of habeas
24   petitions if they are . . . clearly not meritorious despite an
     asserted procedural bar.").  Rather, because the California Court
25   of Appeal alternately rejected Petitioner's prosecutorial
     misconduct allegations on the merits, this Court will apply AEDPA
26   deference to the California Court of Appeal's reasoning.   See
     Clabourne v. Ryan, 745 F.3d 362, 383 (9th Cir. 2014) ("AEDPA
27   deference applies to [an] alternative holding on the merits."),
     overruled in part on other grounds, McKinney v. Ryan, 813 F.3d 798

28

Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Determining whether a due process violation occurred requires an examination of the entire proceedings so the prosecutor's conduct may be placed in its proper context. Boyde v. California, 494 U.S. 370, 384-85 (1990); Greer v. Miller, 483 U.S. 756, 765-66 (1987). Moreover, "[p]rosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct . . . 'had substantial and injurious effect or influence in determining the jury's verdict.'" Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

"'It is improper under the guise of artful cross-examination, to tell the jury the substance of inadmissible evidence.'" United States v. Stinson, 647 F.3d 1196, 1214 (9th Cir. 2011) (citation omitted); see also United States v. Sine, 493 F.3d 1021, 1032 n.8 (9th Cir. 2007) ("[I]ncorporating inadmissible evidence into questioning can constitute prosecutorial misconduct."). Here, however, as the California Court of Appeal found, the prosecutor had a good faith basis for asking Petitioner whether he had engaged in prostitution, and whether he had taken a concealed knife to the

---

(9th Cir. 2015) (en banc), cert. denied, __ S. Ct. __, 2016 WL 1258977 (Oct. 3, 2016); Stephens v. Branker, 570 F.3d 198, 208 (4th Cir. 2009) ("[A]n alternative merits determination to a procedural bar ruling is entitled to AEDPA deference.").

victim's home.  (See Lodgment 4 at 16-17; see also RT 3188-90).
Accordingly, the prosecutor did not commit misconduct in asking
these questions.  See United States v. Cabrera, 201 F.3d 1243, 1247
(9th Cir. 2000) ("[T]he prosecutor did not engage in misconduct.
He did not seek to introduce evidence that had been ruled
inadmissible."); United States v. Etsitty, 130 F.3d 420, 424 (9th
Cir. 1997) (no prosecutorial misconduct when "[n]othing in the
questioning or the answers given can be construed to reflect an
intention by the prosecutor to mislead the jury"), amended by, 140
F.3d 1274 (9th Cir. 1998).

Moreover, even if the prosecutor's questions regarding
Petitioner's observations of animal slaughter were improper, the
trial court sustained defense counsel's objections to the
questions. (RT 3327-30).  The trial court also instructed the jury
that:

> Nothing that the attorneys say is evidence. . . .  Their
> questions are not evidence.  Only the witnesses' answers
> are evidence.  The attorneys' questions are significant
> only if they helped you to understand the witnesses'
> answers.  Do not assume that something is true just
> because one of the attorneys asked a question that
> suggested it was true.  [¶]  During the trial, the
> attorneys objected to questions or moved to strike
> answers given by the witnesses.  I ruled on the
> objections according to the law.  If I sustained an
> objection, you must ignore the question.  If the witness

1          was not permitted to answer, do not guess what the answer
2          might have been or why I ruled as I did.

3

4    (RT 3706; CT 249-50).   The "jury is presumed to follow its
5    instructions[,]" Weeks v. Angelone, 528 U.S. 225, 234 (2000);
6    Blueford v. Arkansas, 132 S. Ct. 2044, 2051 (2012), and Petitioner
7    has provided the Court with "no reason to believe that the jury in
8    this case was incapable of obeying the [trial court's]
9    instructions." Miller, 483 U.S. at 766 n.8; see also Boyde, 494
10   U.S. at 384 ("[A]rguments of counsel generally carry less weight
11   with a jury than do instructions from the court."). Accordingly,
12   Petitioner's allegation that the prosecutor committed misconduct
13   in questioning him about observing the slaughtering of animals is
14   without merit.  See Trillo v. Biter, 769 F.3d 995, 999-1000 (9th
15   Cir. 2014) ("The prosecutor's comment did not materially affect
16   the fairness of the proceedings because the trial court sustained
17   the defendant's objection, and the trial court instructed the jury
18   that '[s]tatements made by the attorneys during trial are not
19   evidence.'  We presume that juries listen to and follow curative
20   instructions from judges."); United States v. Tham, 665 F.2d 855,
21   860 (9th Cir. 1981) (defendant's objections to prosecutor's
22   statements were "meritless" when district court sustained
23   defendant's objections and properly instructed the jury regarding
24   prosecutor's comments).

25

26       Finally, for the reasons discussed above, Petitioner's
27   "allegations of prosecutorial misconduct do not rise to the level
28   of a due process violation even when considered in the aggregate."

27

1    Wood v. Ryan, 693 F.3d 1104, 1116-17 (9th Cir. 2012); see also

2    Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we

3    conclude that no error of constitutional magnitude occurred, no

4    cumulative prejudice is possible."). Accordingly, the California

5    courts' rejection of Ground Two was not contrary to, or an

6    unreasonable application of, clearly established federal law.

7

8    **C.    Petitioner Is Not Entitled To Relief On His Confrontation**

9          **Clause Claim**

10

11        In Ground Three, Petitioner alleges that admission of expert

12   witness testimony about DNA evidence violated his Sixth Amendment

13   right to confront the witnesses against him. (Petition at 7; Reply

14   Mem. at 22-37).

15

16        **1.    Background**

17

18        The California Court of Appeal found the following facts

19   underlying this claim:

20

21          [Aimee] Rogers[, an analyst for Orchard Cellmark,]

22          testified at a hearing under [California] Evidence Code

23          [§] 402[9] about the procedures at the Orchid Cellmark

24          laboratory for extracting and analyzing DNA. She

25          explained that automation specialists placed evidence

26   ───────────────

27   [9]   Cal. Evid. Code § 402 provides, in pertinent part, that "[t]he
     court may hear and determine the question of the admissibility of
     evidence out of the presence or hearing of the jury[.]" Cal. Evid.

28   Code § 402(b).

                                    28

samples into machines which then generated an electropherogram, known as a visual DNA printout. Worksheets of the technician's work and quality assurance tests were kept. Rogers testified that she prepared a report (exhibit 45) based on her analysis of 350 pages of raw data generated by the machines from materials collected from Bradley, [Petitioner], and various locations at the crime scene. She had not personally observed the creation of the data and the work of the technicians, although she reviewed all the worksheets and found no violations of protocols or errors.

[Petitioner] argued that admission of this evidence violated his Sixth Amendment confrontation rights. The trial court concluded that the technicians who took part in the testing process, but who did not testify, were "not themselves reporting any objective facts." The court concluded that they were "submitting the samples to machines, which are generating information, which is now to be used by the expert." It allowed Rogers to testify to her analysis of the DNA.

Rogers then testified before the jury that Bradley's DNA was found on the knife recovered from [Petitioner's] apartment. [Petitioner's] DNA was found on samples taken from the bathroom sink and soap dispenser in Bradley's apartment. The probability that the DNA found on the bathroom sink and soap dispenser belonged to anyone else

29

but [Petitioner] in the southwest Hispanic population was one in 115.4 quadrillion.  The probability of a random unrelated individual in the Black population having the same DNA profile as Bradley's as found on the sink, soap dispenser and knife was one in 438 trillion, one in 2.909 quadrillion in the Caucasian population, one in 10.25 quadrillion in the southeast Hispanic population, one in 34.31 quadrillion in the southwest Hispanic population, and one in 229.4 quadrillion in the Asian population.[10]

(Lodgment 4 at 17-18 (footnotes added); see also RT 1802-95).

### 2.    California Court of Appeal's Opinion

The California Court of Appeal denied Petitioner's claim, stating:

"The Sixth Amendment of the United States Constitution grants a criminal defendant the right to confront adverse witnesses."  In [Crawford v. Washington, 541 U.S. 36 (2004)], "the court created a general rule that the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for

---

[10]  Rodgers testified that the world's population is 6.6 billion so a quadrillion "would be several hundred thousand times the world's population" and a trillion would be "a hundred times the world's population."  (RT 1891-92).

30

1    cross-examination."   The United States Supreme Court

2    applied its <u>Crawford</u> holding in three cases involving

3    laboratory    findings    of    nontestifying    analysts:

4    [<u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009);

5    <u>Bullcoming v. New Mexico</u>, 564 U.S. 647 (2011), and

6    <u>Williams v. Illinois</u>, 132 S. Ct. 2221 (2012)].   Little

7    agreement was reached by the justices in these cases,

8    the first two of which were decided 5-4, although in each

9    case Justice Thomas found a distinct reason for agreeing

10   to the outcome of the majority in each.   In <u>Williams</u>,

11   there was no majority opinion, but a four justice

12   plurality.

13

14       The California Supreme Court addressed this quartet

15   of cases in a trilogy of cases decided in 2012: [<u>People</u>

16   <u>v. Lopez</u>, 55 Cal. 4th 569 (2012), <u>People v. Dungo</u>, 55

17   Cal. 4th 608 (2012), and <u>People v. Rutterschmidt</u>, 55 Cal.

18   4th 650 (2012)].   It carefully examined the various

19   approaches adopted by the United States Supreme Court.

20   The court recognized that the United States Supreme Court

21   had not agreed upon a definition of "testimonial" for

22   confrontation clause purposes.   Based on its reading of

23   the quartet of United States Supreme Court cases, the

24   <u>Lopez</u> court identified two "critical components"

25   required to find a statement testimonial: 1) the

26   statement must have been made with some degree of

27   formality or solemnity; and 2) "all nine high court

28   justices agree that an out-of-court statement is

31

testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be."

The Supreme Court in Lopez reasoned that it need not consider the primary purpose of a nontestifying analyst's laboratory report on blood alcohol level, because it concluded that the critical portions of the report "were not made with the requisite degree of formality or solemnity to be considered testimonial." In Lopez, a report written by a nontestifying analyst was admitted into evidence. A different criminologist testified at trial that he had reviewed the laboratory report and stated the conclusion of the analyst who prepared that report. The testifying analyst went on to say that based on his own experience and review, he had reached the same conclusion.

Five pages of the laboratory report at issue in Lopez were comprised "entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample." Although the nontestifying analyst's signature or initials appeared on each of these five pages, there was no statement, express or implied by him on any of them. The Court concluded that machine generated printouts are not testimonial and do not implicate the Sixth Amendment right to confrontation.

32

While it acknowledged that the United States Supreme Court has not yet addressed this question, the Lopez court agreed with federal appellate courts which had upheld the use of such printouts. It reasoned: "Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts . . . did not implicate the Sixth Amendment's right to confrontation."

Factual distinctions between our case and Lopez bolster the conclusion that Rogers' testimony was not barred by the Sixth Amendment. Here, the only report received into evidence was prepared by Rogers herself, based on raw data generated by machines which she described as "robots" operated by nontestifying automation technologists. The 350 pages of raw data were not admitted into evidence. We conclude that under the reasoning of Lopez, Rogers' reliance on the machine-generated raw data did not violate the [C]onfrontation [C]lause.

The first page of the chart on which the testifying analyst relied in Lopez contained handwritten notations by both the nontestifying analyst and a laboratory assistant, who also did not testify.[fn. 2]   It was undisputed that the information that the defendant's blood sample contained .09 percent alcohol was admitted for its truth.   The Lopez majority concluded that the

notations did not meet the requirements that they be made with formality or solemnity.  Neither the nontestifying analyst who performed the analysis nor the lab assistant signed, certified, or swore to the contents of page one of the report.  Justice Werdegar, in a concurring opinion signed by Chief Justice Cantil-Sakauye, Justice Baxter and Justice Chin, agreed that the logsheet notations were not made with sufficient formality or solemnity to be deemed testimonial.

Respondent argues, and we agree, that there is no evidence that the raw data on which Rogers relied was prepared with the requisite formality or solemnity.  Nor is there here evidence of a sworn certification, declaration, or other formality.  Under these circumstances, we conclude the trial court did not err in allowing Rogers to testify to her own opinions based on the raw data generated by other technicians using various machines.

(Lodgment 4 at 18-21).

3.   **Analysis**

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ."  U.S. Const., Amend. VI.  The Confrontation Clause bars "admission of

34

testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54; Davis v. Washington, 547 U.S. 813, 821 (2006). The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823-24. "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824. As the Davis court explained:

> [a] critical portion of [Crawford's] holding . . . is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Davis, 547 U.S. at 821 (citation omitted). Thus, nontestimonial statements do not implicate the Confrontation Clause. Giles v. California, 554 U.S. 353, 376 (2008); Whorton v. Bockting, 549 U.S. 406, 420 (2007). Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9; see also United States v. Wahchumwah, 710 F.3d 862, 871

35

(9th Cir. 2013) (Crawford "applies only to testimonial hearsay, and 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" (citation omitted)).   Additionally, a Confrontation Clause violation is subject to harmless error analysis.   Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).   A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict.   Brecht, 507 U.S. at 623; Ocampo v. Vail, 649 F.3d 1098, 1114 (9th Cir. 2011).

Rogers, a DNA analyst at Orchid Cellmark laboratory, testified about the laboratory's procedures for extracting and analyzing DNA and the report she personally prepared analyzing the raw data gathered during DNA testing.   (RT 1809-95).   Petitioner contends that Rogers's testimony violated the Confrontation Clause because, even though Rogers personally analyzed and prepared a report based on raw data, she did not personally perform or supervise the preliminary steps through which the raw data was generated, such as DNA extraction, amplification and quantification.   (Reply Mem. at 22-37; see also RT 1811-12, 1848).

The state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable application of clearly established federal law.   The Supreme Court has held that admission of laboratory technicians' affidavits confirming that substances seized from a petitioner were cocaine constituted "testimonial statements" under Crawford, and that "[a]bsent a showing that the

36

analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." Melendez-Diaz, 557 U.S. at 310-11 (emphasis and internal quotation marks omitted). The Supreme Court has also determined that a forensic analyst's certified report of blood alcohol analysis was testimonial, and its admission into evidence through the "surrogate testimony" of a scientist who had neither performed nor observed the testing procedure violated the Confrontation Clause. Bullcoming, 564 U.S. at 659-65. But neither of these cases, nor the Supreme Court's more recent decision in Williams,[11] provides

---

[11]    In Williams, a deeply divided Supreme Court held that an expert's testimony "that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood" did not violate the Confrontation Clause. Williams, 132 S. Ct. at 2227-44 (plurality opinion) & 2255-64 (Thomas, J., concurring). "When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'" Marks v. United States, 430 U.S. 188, 193 (1977) (citation omitted). "[W]hen applying Marks to a fractured Supreme Court decision, [the Court] look[s] to those opinions that concurred in the judgment and determine whether one of those opinions sets forth a rationale that is the logical subset of other, broader opinions. When, however, no 'common denominator of the Court's reasoning' exists, we are bound only by the 'specific result.'" United States v. Davis, 825 F.3d 1014, 1028 (9th Cir. 2016) (en banc). In Williams, "there is no such common denominator between the plurality opinion and Justice Thomas's concurring opinion. Neither of these opinions can be viewed as a logical subset of the other. Rather, Justice Thomas expressly disavows what he views as 'the plurality's flawed analysis[.]'" United States v. Duron-Caldera, 737 F.3d 988, 994 n.4 (5th Cir. 2013) (citation omitted); see also Williams, 132 S. Ct. at 2265 (Kagan, J., dissenting) (explaining that although there are "five votes to approve the admission of the Cellmark report," the Supreme Court "cannot settle on a reason why" the report's admission does not violate the Confrontation Clause). "As Williams does not yield a

"clearly established federal law" applicable here – where the laboratory analyst who wrote the DNA report received into evidence testifies, but the analyst's report "was based on [350 pages of] raw data [not admitted into evidence] generated by machines which she described as 'robots' operated by nontestifying automation technologists."[12] (Lodgment 4 at 20); see Melendez-Diaz, 557 U.S. at 311 n.1 ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case."); Bullcoming, 564 U.S. at 672-73 (Sotomayor, J., concurring) (Bullcoming is not a case in which the testifying witness had a

'narrowest' holding that enjoys the support of five Justices, it does not provide a controlling rule useful to resolving this case." Duron-Caldera, 737 F.3d at 994 n.4; see also United States v. James, 712 F.3d 79, 95 (2d Cir. 2013) ("Williams does not, as far as we can determine, using the Marks analytic approach, yield a single, useful holding relevant to the case before us.  It is therefore for our purposes confined to the particular set of facts presented in that case.").

[12]  Moreover, Crawford "applies only to testimonial hearsay," Wahchumwah, 710 F.3d at 871, and "machine statements aren't hearsay."  United States v. Lizarraga-Tirado, 789 F.3d 1107, 1110 (9th Cir. 2015); see also United States v. Moon, 512 F.3d 359, 362 (7th Cir. 2008) ("A physician may order a blood test for a patient and infer from the levels of sugar and insulin that the patient has diabetes.  The physician's diagnosis is testimonial, but the lab's raw results are not, because data are not 'statements' in any useful sense. . . . Thus, . . . the Sixth Amendment does not demand that a chemist or other testifying expert have done the lab work himself."); United States v. Washington, 498 F.3d 225, 230 (4th Cir. 2007) ("[W]e reject the characterization of the raw data generated by the lab's machines as statements *of the lab technicians* who operated the machines.  The raw data generated by the diagnostic machines are the 'statements' *of the machines* themselves, not their operators. But 'statements' made by machines are not out-of-court statements made by declarants that are subject to the Confrontation Clause." (italics in original)).

connection to the scientific test at issue or "in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence"); Flournoy v. Small, 681 F.3d 1000, 1004-05 (9th Cir. 2012) (no clearly established federal law holds that a forensic laboratory analyst's testimony based on the tests and reports of other crime lab employees violates the Confrontation Clause where the testifying analyst participated in and reviewed the crime lab's work, even though she did not personally conduct all of the testing herself); Grim v. Fisher, 816 F.3d 296, 309 (5th Cir.) ("[T]he Supreme Court has not clearly established what degree of involvement with the forensic testing is required of an in-court witness offered to prove a particular fact in a testimonial certification, beyond what was deemed insufficient in Bullcoming."), cert. denied, __ S. Ct. __, 2016 WL 4083026 (Oct. 3, 2016); United States v. James, 712 F.3d 79, 102 (2d Cir. 2013) ("As Justice Breyer pointed out in Williams, it is still unsettled under the [Supreme] Court's recent Confrontation Clause jurisprudence whether there is a 'logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so.'" (quoting Williams, 132 S. Ct. at 2246 (Breyer, J., concurring)), cert. denied, 134 S. Ct. 2660 (2014). Accordingly, "[t]he California court's decision that the admission of [Rogers's] testimony . . . did not violate the Confrontation Clause was not contrary to or an unreasonable application of clearly established federal law." Flournoy, 681 F.3d at 1004; see also Wright v. Van Patten, 552 U.S. 120, 126

(2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law. Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." (citation and internal quotation marks omitted; brackets in original)); Stenson v. Lambert, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law.").

**D.   Petitioner Is Not Entitled To Relief On His Miranda Claim**

In Ground Four, Petitioner claims a police officer transporting him to jail improperly questioned him in violation of Miranda.  (Petition at 8; Reply Mem. at 37-43).

**1.   Background**

The California Court of Appeal set forth the following facts underlying this claim:

> Detective Frettlhor testified at an Evidence Code
> [§] 402 hearing he advised [Petitioner], in Spanish, of
> his Miranda rights.  This was during an interview at the
> Olympic station on January 5, 2010 at 2:30 a.m.
> [Petitioner] said he understood his rights.  The
> interview ended at approximately 4:00 a.m.  At that

40

point, Detective Matthew Gares arranged for Officer Dana
Grant and her partner to transport [Petitioner] for
booking.  He told Officer Grant that [Petitioner] had
been Mirandized, interviewed, and was ready for booking.
While at the Twin Towers jail facility, [Petitioner]
initiated a conversation with Officer Grant in English.
The conversation culminated in his statement that he had
a knife in his possession when he went to Bradley's
apartment on the day of the murder because he was a
recycler.  [Petitioner] argues this statement should not
have been admitted.

The trial court found that [Petitioner] was properly
advised of his Miranda rights and that he waived them.
Defense counsel argued that [Petitioner] should have been
readvised of his Miranda rights by Officer Grant because
there was a change in interrogator, a change of location,
and [Petitioner] was not reminded that he had been
advised of his Miranda rights.  She argued that
[Petitioner] was not sophisticated in that he used a
Spanish interpreter, did not grow up here, and had no
formal education.  He did not have an extensive criminal
history involving prior contacts with the police and
familiarity with Miranda warnings.  She contended that
Officer Grant was mistaken in believing that [Petitioner]
understood everything she said to him in English.  The
prosecutor argued that only a few hours had passed
between the time [Petitioner] was advised of his Miranda

rights, and [Petitioner] initiated the conversation with
Officer Grant by asking how long he would be in jail.
The prosecutor observed that [Petitioner] had been
arrested in 2007 on a narcotics charge and on one other
occasion.

The trial court ruled that Officer Grant would be
allowed to testify to [Petitioner's] statements because
he had been properly advised of his rights and had waived
his right to remain silent only a few hours before.
Defense counsel then argued that [Petitioner's] question
about how long he would be in jail should not be seen as
allowing Officer Grant to start questioning him about
the crime.  The court said it would review the relevant
authority.  The parties do not advise us that the court
changed its ruling thereafter, and Officer Grant
testified about the statements.

Before the jury, Officer Grant testified that she
was assigned to transport [Petitioner] to jail.  While
at the Twin Towers jail, [Petitioner] asked her in
English how long he would be in jail.  She said she did
not know much about the case, but that it was a serious
charge.  She asked how long he had known "the other guy."
[Petitioner] said he met Bradley when he was 16, got
drunk with him, and then had sex with him, which made
him feel ashamed and dirty.  They had lost touch until
recently ([Petitioner] was then 25 years old) and started

1    having sex again.  She asked [Petitioner] how he had
2    gotten the knife, and testified that [Petitioner]
3    responded "he already had it with him because he was a
4    recycler."  This was the end of the conversation.

5

6    (Lodgment 4 at 21-22; see also RT 1896-98, 2104-25, 2127-32, 2458-
7    66).

8

9        2.   California Court of Appeal's Opinion

10

11   The California Court of Appeal rejected Petitioner's claim,
12   stating:

13

14       "After a valid Miranda waiver, readvisement prior
15   to continued custodial interrogation is unnecessary 'so
16   long as a proper warning has been given, and "the
17   subsequent interrogation is 'reasonably contemporaneous'
18   with the prior knowing and intelligent waiver."  The
19   necessity for readvisement depends upon various
20   circumstances, including the amount of time that has
21   elapsed since the first waiver, changes in the identity
22   of the interrogating officer and the location of the
23   interrogation, any reminder of the prior advisement, the
24   defendant's experience with the criminal justice system,
25   and '[other] indicia that the defendant subjectively
26   underst[ood] and waive[d] his rights.'" . . .

27                    *     *     *

28

43

Here, [Petitioner] acknowledges that the five hours that elapsed between the time he was advised of his Miranda rights by Detective Frettlhor and his admission about the knife to Officer Grant is shorter than the time frames found sufficiently contemporaneous in a number of cases which did not require readvisement. But he argues that his second statement was made in a different location to a different officer. He also contends that he was unsophisticated, citing his limited English skills, lack of education, and childhood in Mexico. He discounts his two prior arrests for narcotics-related offenses. He asserts: "It would be reasonable for [Petitioner] to believe the questioning by Officer Grant was not something that would be used against him since it was done in a police car, in English, by a different interrogator, and without any reference to Miranda."

Officer Grant testified at trial that [Petitioner] initiated the conversation with her "[w]hile at Twin Towers" when she was "next to [him]." [Petitioner] had been arrested and was waiting for booking in a jail facility, accompanied by a police officer. He had two prior arrests from which we can reasonably assume he was familiar with criminal procedures, including Miranda warnings. Only five hours before, he had been given his rights and waived them. Significantly, he initiated the conversation with Officer Grant. Under the totality of these circumstances, we find no error in admission of

his statement to Officer Grant about bringing a knife to
the crime scene.

(Lodgment 4 at 23-24 (citations omitted)).

### 3.   Analysis

The Fifth Amendment privilege against self-incrimination
provides that "[n]o person . . . shall be compelled in any criminal
case to be a witness against himself."  In Miranda, the Supreme
Court established a prophylactic procedural mechanism to safeguard
a defendant's Fifth Amendment privilege against the inherently
coercive effects of custodial interrogation.  Miranda, 384 U.S. at
457-58.  Thus, Miranda requires that before questioning a suspect
in custody, law enforcement officials must inform the suspect that:

He has the right to remain silent, that anything he
says can be used against him in a court of law, that he
has the right to the presence of an attorney, and that
if he cannot afford an attorney one will be appointed
for him prior to any questioning if he so desires.

Id. at 444, 478-79; Thompkins, 560 U.S. at 380.

Petitioner does not dispute the validity of his initial
Miranda waiver, which was made before Detective Frettlhor
interviewed him at the police station.  (Petition at 8; Reply Mem.
at 37-43).  Rather, Petitioner argues that Officer Grant should

45

1  have re-administered Miranda warnings before questioning him while

2  en route from the police station to jail.  (Reply Mem. at 38-43).

3

4      Petitioner has not identified, and the Court is not aware, of

5  any clearly established federal law requiring Officer Grant to re-

6  administer Miranda warnings in the circumstances presented here.

7  See Thompkins, 560 U.S. at 386 ("Police are not required to rewarn

8  suspects from time to time."); United States v. Rodriguez-Preciado,

9  399 F.3d 1118, 1128 (9th Cir. 2005) (Rodriguez-Preciado "does not

10 cite a Supreme Court or Ninth Circuit decision — and we are aware

11 of none — holding that statements made after Miranda warnings are

12 administered are nonetheless inadmissible if the warnings become

13 'stale.'").  To the contrary, "'[t]here is no requirement that an

14 accused be continually reminded of his rights once he has

15 intelligently waived them.'"  United States v. Andaverde, 64 F.3d

16 1305, 1312 (9th Cir. 1995) (citations omitted); McClain v. Hill,

17 52 F. Supp. 2d 1133, 1141 (C.D. Cal. 1999).  Furthermore, "[a]

18 rewarning is not required simply because there is a break in

19 questioning[,]" People of Territory of Guam v. Dela Pena, 72 F.3d

20 767, 769-70 (9th Cir. 1995); Rodriguez-Preciado, 399 F.3d at 1128;

21 see also Wyrick v. Fields, 459 U.S. 42, 47 (1982) (per curiam)

22 (defendant, who requested polygraph and waived Miranda rights, did

23 so not only for the polygraph but also "validly waived his right

24 to have counsel present at 'post-test' questioning, unless the

25 circumstances changed so seriously that his answers no longer were

26 voluntary, or unless he no longer was making a 'knowing and

27 intelligent relinquishment or abandonment' of his rights."), and

28 courts have determined that breaks of much longer than the five

hours at issue here did not render a statement inadmissible. See, e.g., Rodriguez-Preciado, 399 F.3d at 1128 (upholding admissibility of statements made approximately sixteen hours after Miranda warnings were given and waived); Dela Pena, 72 F.3d at 770 (fifteen hours between Miranda warning and waiver and confession did not render confession inadmissible); Andaverde, 64 F.3d at 1313 (one day interval between Miranda warning and waiver and incriminating statement did not render statement inadmissible).

Petitioner nevertheless asserts that re-warning was required because a different officer questioned him in a different location. (Reply Mem. at 39-42). But "a Miranda warning does not lose its efficacy if a defendant is warned by one officer and then interrogated by another[,]" even if the interrogation takes place in a different location than the warning. Andaverde, 64 F.3d at 1312-13; see also Rodriguez-Preciado, 399 F.3d at 1129 (change in interrogator and change in location (from motel to jail) did not require rewarning); Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984) ("[W]e do not view a confession given less than four hours after the issuance of Miranda warnings inadmissible because of the failure to reissue the warnings" even though Miranda warnings were given by a different officer in a different location). This is particularly true here since Petitioner "was in custody continually from the time warnings were first administered through" his conversation with Officer Grant and "there were no intervening events which might have given [Petitioner] the impression that his rights had changed in a material way." Rodriguez-Preciado, 399 F.3d at 1129.

Accordingly, the California courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law.

## E.   Petitioner Is Not Entitled To Relief On His Claim That The Trial Court Inadequately Responded To A Jury Question

In Ground Five, Petitioner claims the trial court failed to adequately respond to the jury's question about the difference between first and second degree murder.  (Petition at 8; Reply Mem. at 43-49).

### 1.   Background

The California Court of Appeal found the following facts underlying this claim:

The jury was given CALCRIM Nos. 520 and 521.  As given, CALCRIM No. 520 was titled: **"First or Second Degree Murder With Malice Aforethought (Pen. Code, § 187).**[fn. 3]

[Fn. 3]  As given, CALCRIM No. 520 read: "The defendant is charged with murder.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND

48

[¶] 3. He killed without lawful excuse or justification.
[¶]  There are two kinds of malice aforethought, express
malice and implied malice.  Proof of either is sufficient
to establish the state of mind required for murder.  [¶]
The defendant acted with *express malice* if he unlawfully
intended to kill.  [¶]  The defendant acted with *implied*
*malice* if: [¶] 1. He intentionally committed an act; [¶]
2. The natural and probable consequences of the act were
dangerous to human life; [¶] 3. At the time he acted, he
knew his act was dangerous to human life; [¶] AND [¶] 4.
He deliberately acted with conscious disregard for human
life.  [¶]  Malice aforethought does not require hatred
or ill will toward the victim.  It is a mental state that
must be formed before the act that causes death is
committed.  It does not require deliberation or the
passage of any particular period of time.  [¶]  If you
decide that the defendant committed murder, you must then
decide whether it is murder of the first or second
degree."

As given, CALCRIM No. 521 was titled: **"First Degree**
**Murder (Pen. Code, § 189)"**  It read: The defendant is
guilty of first degree murder if the People have proved
that he acted willfully, deliberately, and with
premeditation.  The defendant acted *willfully* if he
intended to kill.  The defendant acted *deliberately* if
he carefully weighed the considerations for and against
his choice and, knowing the consequences, decided to

kill.   The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.   [¶]   The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.   The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.   A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.   On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.   [¶]   The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.   [¶]   The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime.   If the People have not met this burden, you must find the defendant not guilty of first degree murder."

During deliberations, the jury sent the following note to the court: "'We need a clear definition, please, between first and second degree murder.'"   The court informed counsel that it had asked the jury to be more specific.   The jury responded: "'There is some confusion due to instructions, its wording, in particular, page 9 re: 521 mentioned explanation in 520, but we need some

clarification.'"  The court concluded that this question referred to the following language in CALCRIM number 521: "'Requirements for second degree murder, based on expressed or implied malice, are explained in CALCRIM number 520, first or second degree murder with malice aforethought.'"  The court observed: "[I]t does stand out because there's nothing in 520 that makes mention of second degree murder or expressed or implied malice."

After further colloquy, it was agreed the jury would be brought into the courtroom.  The court told the jury there were two options, to reread the particular instructions, or to have the foreperson ask for further clarification.  The foreperson said: "We've read them a couple times already, the instructions.  521 states that the definition of second degree is found in 520."  The court interjected that this was correct.  The foreperson continued: "But 520, the title is first and second degree."  The court suggested that the jury ignore the titles of the instructions and asked if this would help deliberations.  The foreperson answered: "Right."  The court explained that titles of instructions are used only for quick reference.  He inquired whether the foreperson wanted to go back into the jury room to ask the fellow jurors whether further clarification was needed.  No additional questions or notes were sent by the jury.

The trial court judge told the jury that he would be absent the next day, but if it wanted to continue deliberations, it could do so with another judge presiding.  Although it is not reflected in the record, apparently this was the choice of the jurors because they resumed deliberations the next day with a different trial court judge presiding.  At the outset of the day, outside the presence of the jury, that judge stated his understanding that there was an issue about the jury and asked counsel for background.  Defense counsel recounted the foreperson's concern about the title of CALCRIM No. 520, but said it was not clear exactly what the jury was unclear about.  She said that overnight she had become uncertain as to whether the trial judge's suggestion to ignore the titles of the instructions cured the jury's confusion.  The substitute judge indicated that the titles for instructions are not part of the instruction to be considered by the jury.  The prosecutor agreed. The court asked whether the jury had sent out any questions since the direction to ignore the titles the previous day.  The prosecutor said that it had not.  The court said it wanted to be certain that there was no pending jury question.  It indicated: "If there's no pending jury question, it seems to be prudent just to allow the jury to continue to deliberate based upon whatever answer or response Judge Landin gave, and if they have a need for further clarification, we can always address it if it comes to pass."

Defense counsel asked the court to make it clear that CALCRIM No. 520 does describe first and second degree murder and to remind the jury that the third element, whether it was a justifiable or excusable homicide, was addressed in other instructions the jury already had received.  The court expressed reluctance to do so since it had not heard the previous discussion with the jurors or the colloquy between Judge Landin and counsel.  It was not inclined to "bring the jury out and tell them something that I don't know needs to be told."  The prosecutor concurred.  The court made it clear that it would be willing to respond to any further question from the jury after consultation with counsel.  Later that day, following a recess, the jury reached a guilty verdict on second degree murder.

(Lodgment 4 at 25-27 (italics in original); see also CT 246, 255-56; RT 3912-14, 4204-15, 4501-06).

## 2.   California Court of Appeal's Opinion

The California Court of Appeal, construing Petitioner's allegations as raising only a state law claim, rejected Petitioner's claim, stating:

The jury was understandably confused about the definition of second degree murder as treated in CALCRIM Nos. 520 and 521, but [Petitioner] is not raising a

53

separate issue of instructional error. Instead, his argument is that the trial court did not adequately respond to the jury's questions. These instructions required the jury to determine whether [Petitioner] acted with malice aforethought, and if it found he did, whether the killing was premeditated, willful, or deliberate in order to eliminate first degree murder, and then consider second degree murder, an analysis made more difficult by these instructions. But the instructions made it clear that if the jury found that [Petitioner] acted with malice aforethought, he was guilty of either first or second degree murder rather than voluntary manslaughter or was not guilty because the killing was a justified homicide on a self-defense theory. Since the jury did reject the first degree murder theory, we find no prejudicial error in the trial court's response to the jury's questions. In addition, the court gave the jury ample opportunity to express any continuing confusion about these instructions and it did not. There is no support for [Petitioner's] speculative argument regarding prejudice. The jury had no questions about the instructions on voluntary manslaughter, self-defense, or imperfect self-defense.

A claim that the trial court failed to adequately answer a jury's question under [P.C. §] 1138[13] is

_____

13  P.C. § 1138 provides:

subject to the standard of [People v. Watson, 46 Cal. 2d
818 (1956)[14]: whether the error "resulted in a reasonable
probability of a less favorable outcome."  Since the jury
had to conclude that [Petitioner] acted with malice in
order to convict him of second degree murder, there is
no reasonable probability of a better outcome.

(Lodgment 4 at 27 (citation omitted; footnotes added)).

### 3.   Analysis

Instructional error warrants federal habeas relief only if
the "'instruction by itself so infected the entire trial that the
resulting conviction violates due process[.]'"   Waddington v.
Sarausad, 555 U.S. 179, 191 (2009) (citation and internal quotation
marks omitted); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per
curiam).   The instruction must be more than merely erroneous.
Instead, Petitioner must show there was a "reasonable likelihood

---

After the jury have retired for deliberation, if there
be any disagreement between them as to the testimony, or
if they desire to be informed on any point of law arising
in the case, they must require the officer to conduct
them into court.  Upon being brought into court, the
information required must be given in the presence of,
or after notice to, the prosecuting attorney, and the
defendant or his counsel, or after they have been called.

[14]  "The Watson harmless error standard is the standard applied by
California appellate courts in reviewing non-constitutional
magnitude trial errors by determining whether 'it is reasonably
probable that a result more favorable to the appealing party would
have been reached in the absence of the error.'"   Merolillo v.
Yates, 663 F.3d 444, 452 n.4 (9th Cir. 2011) (quoting Watson, 46
Cal. 2d at 836).

that the jury has applied the challenged instruction in a way that violates the Constitution." McNeil, 541 U.S. at 437 (citations and internal quotation marks omitted); Sarausda, 555 U.S. at 190-91; see also Cupp v. Naughten, 414 U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used, it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72 (citation omitted); Sarausda, 555 U.S. at 191. Moreover, if a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, i.e., unless it had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 61-62 (2008) (per curiam); Brecht, 507 U.S. at 623.

Here, as the California Court of Appeal noted (Lodgment 4 at 28), Petitioner does not allege that the court provided erroneous instructions to the jury. (Petition at 8; Reply Mem. at 43-49); see also People v. Johnigan, 196 Cal. App. 4th 1084, 1092 (2011) (CALCRIM 520 is an "accurate statement[] of the law [regarding second degree murder] and complete."). Rather, Petitioner complains that the trial court did not adequately respond to the

56

jury's evident confusion about the difference between first and second degree murder.  (Petition at 8; Reply Mem. at 43-49).

"'The Supreme Court has clearly stated that it is reversible error for a trial judge to give an answer to a jury's question that is misleading, unresponsive, or legally incorrect.'" United States v. Anekwu, 695 F.3d 967, 986 (9th Cir. 2012) (quoting United States v. Frega, 179 F.3d 793, 810 (9th Cir. 1999)).  Instead, "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13 (1946); Anekwu, 695 F.3d at 986.

After receiving the jury's note and discussing the matter with counsel, the trial court brought the jury into the courtroom and inquired into the nature of the jury's confusion, and the jury foreperson stated "We've read [CALCRIM 520 and 521] a couple [of] times already. . . .  521 states that the definition of second degree [murder] is found in 520 . . . but 520, the title is first and second degree."  (RT 4204-11).  The trial court responded:

> That just occurred to me, that sometimes we get hung up
> on the titles of the instructions, and . . . they are
> not always very specific.  So I suggest you ignore the
> titles to the instructions.  Do you think that would help
> . . . if you went back there and crossed out all the
> titles?  The only reason I think we include the titles
> is for quick reference to look up, for example,
> involuntary manslaughter, instead of the number.

1    Sometimes, if we describe it too much, that could cause

2    some confusion.  Do you want to go back and talk to your

3    fellow jurors to see if you need further clarification?

4

5  (RT 4211-12).  The trial court also advised the jury to "report

6  back whether you need more clarification[,]" but the jury raised

7  no further issues and instead reached a verdict.  (RT 4213, 4501-

8  09).

9

10   "A jury is presumed to follow its instructions" and "to

11  understand a judge's answer to its question[,]" Weeks, 528 U.S. at

12  234; see also Sarausad, 555 U.S. at 196 ("Where a judge 'respond[s]

13  to the jury's question by directing its attention to the precise

14  paragraph of the constitutionally adequate instruction that answers

15  its inquiry,' and the jury asks no followup question, this Court

16  has presumed that the jury fully understood the judge's answer and

17  appropriately applied the jury instructions." (citation omitted)).

18  Petitioner has failed to provide any reason to believe the jury

19  was incapable of following the trial court's instructions.  Miller,

20  483 U.S. at 766 n.8.  Accordingly, Ground Five is without merit.

21  Sarausad, 555 U.S. at 196; Weeks, 528 U.S. at 234-37; Anekwu, 695

22  F.3d at 987.

23

24  **F.    Petitioner Is Not Entitled To Relief On His Insufficient**

25      **Evidence Claim**

26

27   In Ground Six, Petitioner claims there was insufficient

28  evidence to convict him of second degree murder because the

58

evidence demonstrated he committed voluntary manslaughter, not murder. (Petition at 8-9; Reply Mem. at 50-55).

1. **California Court of Appeal's Opinion**

The California Court of Appeal rejected Petitioner's claim, stating:

> There was sufficient evidence to support an instruction on voluntary manslaughter committed in the heat of passion and the jury was instructed on that theory. But it rejected it. There was evidence from [Petitioner's] statement to Officer Grant that he brought the knife used in the killing to Bradley's apartment. Respondent also cites the telephone conversation overheard by Bradley's neighbor, in which Bradley said that he would not pay for sex. The bedroom had been ransacked and cash and other valuables were missing from the apartment. The jury could reasonably conclude that the murder was committed for financial motives rather than in the heat of passion. "'"'[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'"'" The conviction of second degree murder is supported by substantial evidence.

(Lodgment 4 at 30 (citation omitted)).

1          **2.   Analysis**

2

3          To review the sufficiency of the evidence in a habeas corpus

4     proceeding, the court must determine "whether, after viewing the

5     evidence in the light most favorable to the prosecution, any

6     rational trier of fact could have found the essential elements of

7     the crime beyond a reasonable doubt." Jackson v. Virginia, 443

8     U.S. 307, 319 (1979) (emphasis omitted); Parker v. Matthews, 132

9     S. Ct. 2148, 2152 (2012) (per curiam); see also Coleman v. Johnson,

10    132 S. Ct. 2060, 2065 (2012) (per curiam) ("[T]he only question

11    under Jackson is whether [the jury's] finding was so insupportable

12    as to fall below the threshold of bare rationality."). "'[A]

13    reviewing court must consider all of the evidence admitted by the

14    trial court,' regardless [of] whether that evidence was admitted

15    erroneously," McDaniel v. Brown, 558 U.S. 120, 131 (2010) (per

16    curiam) (citation omitted), all evidence must be considered in the

17    light most favorable to the prosecution, Jeffers, 497 U.S. at 782;

18    Jackson, 443 U.S. at 319, and if the facts support conflicting

19    inferences, reviewing courts "must presume – even if it does not

20    affirmatively appear in the record – that the trier of fact resolved

21    any such conflicts in favor of the prosecution, and must defer to

22    that resolution." Jackson, 443 U.S. at 326; Cavazos v. Smith, 132

23    S. Ct. 2, 6 (2011) (per curiam). Furthermore, under AEDPA, federal

24    courts must "apply the standards of [Jackson] with an additional

25    layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th

26    Cir. 2005); Boyer v. Belleque, 659 F.3d 957, 964-65 (9th Cir.

27    2011). These standards are applied to the substantive elements of

28    the criminal offense under state law. Jackson, 443 U.S. at 324

n.16; <u>Boyer</u>, 659 F.3d at 964; <u>see also Johnson</u>, 132 S. Ct. at 2064 ("Under <u>Jackson</u>, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and quotation marks omitted)).

Under California law, "'[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" <u>People v. Elmore</u>, 59 Cal. 4th 121, 133 (2014) (quoting <u>People v. Knoller</u>, 41 Cal. 4th 139, 151 (2007)); <u>People v. Beltran</u>, 56 Cal. 4th 935, 942 (2013). "Malice aforethought may be express or implied." <u>Beltran</u>, 56 Cal. 4th at 941; P.C. § 188. "Express malice is an intent to kill." <u>People v. Gonzalez</u>, 54 Cal. 4th 643, 653 (2012); <u>Beltran</u>, 56 Cal. 4th at 941. "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." <u>Elmore</u>, 59 Cal. 4th at 133; <u>Beltran</u>, 56 Cal. 4th at 941-42; <u>see also People v. Olivas</u>, 172 Cal. App. 3d 984, 987-88 (1985) ("Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'").

Here, there is no dispute that Petitioner killed the victim. (<u>See</u>, <u>e.g.</u>, RT 3972 (Petitioner "did take [the victim's] life, and

that is a horrible thing, but that doesn't make him a murderer."); Reply Mem. at 55 (The "evidence proved [overwhelmingly] that [P]etitioner killed [the victim] in the heat of passion. . . .")). Indeed, Petitioner conceded he cut the victim's neck with a knife. (RT 3158-59). Moreover, coroner Dr. James Ribe testified that the victim died from a "slash wound which was made by a bladed instrument such as a knife . . . made using a large amount of force by an assailant" who inflicted "extensive and very deep cutting of the structures of the [victim's] anterior neck, including all of the muscles down to the vertebral column, the larynx, a number of branch arteries within the neck and the right common carotid artery and right internal carotid artery." (RT 2140-44). Such evidence is sufficient to support the jury's conclusion that Petitioner killed the victim, and did so with malice aforethought, i.e., express or implied malice. See, e.g., People v. Bolden, 29 Cal. 4th 515, 561 (2002) ("[T]he victim died from a single stab wound to the back that penetrated the victim's lungs and spleen. The stab wound was five inches long and five to six inches deep . . . . In plunging the knife so deeply into such a vital area of the body of an apparently unsuspecting and defenseless victim, defendant could have had no other intent than to kill.");[15] People v. Moore, 96 Cal. App. 4th 1105, 1114 (2002) (stabbing the victim in "an extremely vulnerable area of the body" supports an intent to kill).

\\

\\

---

[15] As stated above, "[i]ntent to unlawfully kill and express malice are, in essence, 'one and the same.'" People v. Smith, 37 Cal. 4th 733, 739 (2005) (citation omitted).

Petitioner nevertheless argues that his conviction should be reduced to voluntary manslaughter because the evidence overwhelmingly established he acted in the heat of passion.[16] (Petition at 8-9; Reply Mem. at 50-55). As the California Court of Appeal noted, "[t]here was sufficient evidence to support an instruction on voluntary manslaughter committed in the heat of passion and the jury was instructed on that theory."[17] (Lodgment 4 at 30; see also CT 257-60). However, the jury rejected Petitioner's evidence, as it was entitled to do. See Smith, 132 S. Ct. at 4 ("[I]t is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial."); Long v. Johnson, 736 F.3d 891, 896 (9th Cir.

---

[16] "Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." People v. Nelson, 1 Cal. 5th 513, 538 (2016); Beltran, 56 Cal. 4th at 942. "Heat of passion arises if, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." Beltran, 56 Cal. 4th at 942 (citation and internal quotation marks omitted); Nelson, 1 Cal. 5th at 538-39. "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." Beltran, 56 Cal. 4th at 942; Nelson, 1 Cal. 5th at 539.

[17] Among other things, the trial court properly instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that [Petitioner] did not kill as the result of a sudden quarrel or in the heat of passion." (CT 260); see also Mullaney v. Wilbur, 421 U.S. 684, 704 (1975) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.").

1    2013) ("Although the evidence presented at trial could yield an

2    alternative inference, we 'must respect the exclusive province of

3    the [jury] to determine the credibility of witnesses, resolve

4    evidentiary conflicts, and draw reasonable inferences from proven

5    facts.'" (citation omitted))). As the California Court of Appeal

6    found, the prosecution presented sufficient evidence for the "jury

7    [to] reasonably conclude that the murder was committed for

8    financial motive rather than in the heat of passion[,]"[18] (Lodgment

9    4 at 30). Accordingly, the California courts' rejection of Ground

10   Six was not contrary to, or an unreasonable application of, clearly

11   established federal law.

12   \\

13   \\

14   \\

15   \\

16   \\

17   \\

18

19   [18]  This evidence included testimony that: Petitioner had indicated
     he had a history of trading sex with the victim for drugs (RT
20   3650); on the afternoon of the victim's murder, the victim's
     neighbor overhead the victim talking to someone on the phone and
21   telling that person "If you're coming over for sex, I don't pay
     for sex. I'm not like that" and "I don't loan people out because
22   it's hard to get back" (RT 915-18, 3658-59); the victim had made a
     telephone call to Petitioner at around the time of the conversation
23   the victim's neighbor overheard (RT 2517); Petitioner had a knife
     with him when he went to the victim's home (RT 2461); the victim
24   was killed without any sign of struggle, suggesting he was taken
     by surprise and contradicting Petitioner's claim that he fought
25   off the victim who was attempting to rape him (RT 2455-57, 2474-
     75); and the victim's bedroom had been "ransacked," his jewel
26   collection and new cell phone were missing, and the victim's wallet
     was found near his body with a bank card in it but no cash. (RT
27   1229-30, 1517-22, 1577-78, 1922-23, 2434-37, 2476-77, 2510-12).

28

## VII.

## CONCLUSION

For the foregoing reasons, the Petition for Writ of Habeas Corpus is DENIED and Judgment shall be entered dismissing this action with prejudice.

DATED:  November 21, 2016

                                        /S/
                                   _____
                                   SUZANNE H. SEGAL
                                   UNITED STATES MAGISTRATE JUDGE